# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

NICHOLAS DEAN                                    )        Civil Action No. 3:19-cv-566
                                                 )
               Plaintiff,                        )
                                                 )
v.                                               )
                                                 )
CHARLES EASTERLING                               )
a/k/a Abdul Aziz                                 )
a/k/a Nuckyt1920                                 )
a/k/a Crescent Unmanned Systems, LLC             )
                                                 )
and                                              )
                                                 )
ADVANCE LOCAL MEDIA, LLC                         )
a/k/a The Times-Picayune                         )
a/k/a NOLA.com,                                  )
a/k/a NOLA Media Group                           )
a/k/a NOLA Media Group LLC                       )
a/k/a NOLA Media Group L.L.C.                    )
a/k/a Advance Media Southeast LLC                )
                                                 )
               Defendants.                       )
_____)

## COMPLAINT

### (WITH DEMAND FOR JURY TRIAL)

Plaintiff Nicholas Dean ("Dean"), by counsel, sues Charles Easterling ("Defendant Easterling") and Advance Local Media, LLC d/b/a The Times-Picayune, d/b/a as NOLA.com, and as d/b/a NOLA Media Group ("Defendant NOLA.com") in this civil action for Common Law Defamation *Per Se* (libel and slander), General Defamation (libel and slander), Defamation by Implication (libel and slander), Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Advantage, and Assault, as a result of Defendant Easterling causing actual damages, compensatory damages, and giving rise to punitive damages as well,

including continuing and aggravated harm to Dean's professional, business, and personal reputation and livelihood. As grounds therefore, Dean alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 United States Code (U.S.C.) §1332 under diversity of citizenship. Jurisdiction is determined at the time of suit, not at the time of tort. Grupo Dataflux v. Atlas Glob. Grp., L.P., 541 U.S. 567, 571 (2004). The parties are citizens of different states and the amount in controversy exceeds $75,000.

2. Venue is proper for Defendants Easterling and NOLA.com pursuant to 28 U.S.C. § 1391(b)(3).

3. The Causes of Action and the injuries were caused to Dean by the Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide, and internationally. Florida's long-arm statute subjects non-residents to jurisdiction if they commit a tortious act within the state of Florida. Fla. Stat. Ann. § 48.193(1)(a)(2).

4. The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

5. A lawsuit may be maintained in Florida for libelous posting on a website housed elsewhere if the site was accessible to Floridians. Internet Solutions Corp. v. Marshall, 39 So.3d 1201, 1203 (Fla. 2010).

6. Nonresident plaintiffs can commit tortious acts in Florida from outside the state by virtue of "telephonic, electronic, or written communications *into* Florida." Internet Solutions Corp. v. Marshall, 39 So.3d 1201, 1208 (Fla. 2010).

7.    Under Eleventh Circuit precedent, engaging in tortious activity outside Florida that results in injury within Florida, is committing a tortious act in Florida. Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1217 (11th Cir. 1999), quoted in Silvers v. Verbata, Inc., No. 5:17-cv-169-Oc-34PRL, 2017 U.S. Dist. LEXIS 216293, at *9 (M.D. Fla. Dec. 1, 2017).

8.    Dean has made a prima facie showing that Defendants' defamatory statements were accessed by a third party in Florida, as required by Florida law. Catalyst Pharm., Inc. v. Fullerton, No. 17-15196, 2018 U.S. App. LEXIS 25115, at *5 (11th Cir. Sep. 5, 2018).

## II.    THE PARTIES

9.    Nicholas Dean is a natural person, an individual, and a citizen of the United States. He is a citizen of the State of Florida.

10.    Charles Easterling, also known as, Abdul Aziz (Defendant Easterling) is a natural person who resides in the State of Louisiana and does business as Crescent Unmanned Systems, LLC, which is currently listed as inactive by the Louisiana Secretary of State.   Defendant Easterling writes under the internet pseudonyms, "Abdul Aziz" and "Nuckyt1920."

11.    Advance Local Media LLC is a New York Limited Liability Company doing business as (a) NOLA.com, an internet website: (b) NOLA Media Group, which is stated as the copyright holder of the content of the NOLA.com website; and (c) The Times-Picayune, a newspaper.  Advance Local Media LLC is the survivor of a 2018 merger with Advance Media Southeast LLC, which was the survivor of a 2018 merger with The Times-Picayune LLC, a Louisiana Limited Liability Company.   The Times-Picayune Newspaper is listed by the Louisiana Secretary of State as "NOLA Media Group/The Times-Picayune", and is, according to the Secretary of State, the journal of record for the Parish of Orleans, State of Louisiana.  NOLA Media Group LLC and NOLA Media Group L.L.C. are inactive Louisiana Limited Liability

Companies.  The trade name, NOLA Media Group, is registered with the Louisiana Secretary of State by Advance Local Media LLC.

### III.    FACTS COMMON TO ALL COUNTS

12.    Dean sues for harm and thus damages in this district, Florida in general, nationwide, and internationally, to himself as an individual, as a result of Defendants' defamation and other tortious conduct, which damages include financial harm through the loss of Dean's employment with Rite of Passage in his position as principal of Crescent Leadership Academy, the loss of future earnings of no less than the amount of his previous annual salary as principal of Crescent Leadership Academy, $138,000 per year, from the time of his dismissal through average retirement age, damage to his professional reputation as an educator and education administrator, loss of professional opportunities in the field of education and otherwise, intentional infliction of emotional distress, and assault for placing Dean in immediate fear of bodily harm, injury, and death, by terrorists identified as such by the Federal Bureau of Investigation; to wit, the Anti-Fascist Organization commonly known as "Antifa," and its associated pro-communist political street activists, as well as other harm and thus damages to be uncovered during discovery.

**Nicholas Dean Not a Public Figure**

13.    Dean is a private citizen and at all material times acted individually.

14.    Dean has not sought any form of publicity, public note or prominence outside of his engagement in his profession as a teacher and school administrator in the employment of Rite of Passage, a private secondary school.  In connection with his achievements and meritorious conduct as a teacher and school administrator, Dean has occasionally been the subject of newspaper articles and interviews detailing his work with at-risk students at Rite of Passage

schools, but these stories, focused on the schools managed by Rite of Passage, do not raise Dean to the level of a public figure.

15.     Dean has not sought or held any public office or any position in local, state, or federal government.

16.     Dean thus is not a public figure based on the facts.

17.     Dean has not sought or acquired any position of public power or influence that would give him the ability to protect himself apart from the courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964).

18.     Dean is not a public figure within the meaning of *New York Times v. Sullivan,* 376 U.S. 254 (1964) or its progeny.

**Defamation of Plaintiff Nicholas Dean by Defendants in News Publications and in Public Social Media Posts**

### *Defendant Easterling*

19.     On May 25, 2017, Defendant Easterling, under the pseudonym "Abdul Aziz", published a post to his public Facebook account ("Facebook Post") and published a public YouTube Video ("YouTube Video") under the YouTube account of "Abdul Aziz"; both the Facebook Post and the YouTube Video named Dean in relation to a (upon information and belief: permitted) public gathering attended by members of the pubic both in support of and opposed to the removal of Confederate Monuments in the City of New Orleans.

20.     Defendant Easterling's May 25, 2017, Facebook Post contains photographs of Dean taken on May 7, 2017 and statements regarding Dean; the YouTube Video contains a video of Dean taken on May 7, 2017 and, in the description section of the video, contains the same statements regarding Dean with the addition of text stating that at ":22 seconds into the video

[Dean] can be seen wearing two rings…."  The statements in both the Facebook Post and the YouTube Video contain untrue, spurious, defamatory, slanderous, and libelous information about Dean's appearance, personal attire, and group affiliation on May 7, 2017.

21.     Defendant Easterling's May 25, 2017, the Facebook Post and the YouTube Video named Dean as principal of Crescent Leadership Academy, and stated Dean was in attendance at the May 7, 2017, "Battle of New Orleans."  Dean was principal of Crescent Leadership Academy and Dean was present at a permitted public demonstration in the City of New Orleans on May 7, 2017, along with numerous members of the public; however, Defendant Easterling's reference to Dean in connection to a "Battle of New Orleans" infers that Dean participated in a public altercation.  Dean was not involved and did not participate in any altercation that may have occurred on May 7, 2017.

22.     Defendant Easterling's May 25, 2017, Facebook Post features a photograph of Dean with a circle drawn around two rings worn by Dean and text added to the photograph with an arrow pointing to the rings.  The YouTube Video, rather than having markings on the photograph, contains text in the summary section stating that at ":22 seconds into the video [Dean] can be seen wearing two rings…." Both the Facebook Post and the YouTube Video description go on to state that the rings depict a "Nazi SS skull" and a "German Iron Cross" and that the rings are "both symbols of the Nazi regime."  These statements by Defendant Easterling are untrue, spurious, defamatory, slanderous, and libelous as neither the skull ring nor the Iron Cross ring worn by Dean in the photograph and video have any connection to the "Nazi" party/regime or to the "SS."  The skull ring worn by Dean in the photograph is a Mexican "sugar skull" ring and the Iron Cross or Maltese cross ring worn by Dean in the photograph is a version

of the Christian cross that predates and is not, in the form worn by Dean, a symbol of the Nazi regime.

23.    Defendant Easterling's May 25, 2017, Facebook Post states that Dean was, on May 7, 2017, "aligned with "known white nationalist organizations, such as the Ku Klux Klan, the League of the South, and the Based Stick Man movement." The statement is also untrue, spurious, defamatory, slanderous, and libelous as on May 7, 2017, Dean was neither present as a member of nor was he "aligned with" any "known white nationalist organizations" named by Defendant Easterling or otherwise. Dean was present as a private individual exercising his right of assembly guaranteed in the First Amendment to the United States Constitution.

24.    A printed copy, downloaded from the Internet, of Defendant Easterling's May 25, 2017, 9:45 a.m. public Facebook Post concerning Dean is attached for the Court as Exhibit A; a printed copy, downloaded from the Internet, of screenshots of both the video and description sections of Defendant Easterling's May 25, 2017 YouTube Video is attached for the Court as Exhibit B. A video copy, downloaded from the Internet, of Defendant Easterling's May 25, 2017 YouTube Video will be presented into evidence.

25.    On May 25, 2017, at 1:01 p.m., under the pseudonym "Abdul Aziz", Defendant Easterling published another post to his public Facebook account, bragging about having Dean terminated from his place of employment and posting a copy of an article from NOLA.com that repeats Defendant Easterling's untrue and defamatory statement that Dean had worn "Nazi-associated rings" in a video. Defendant Easterling's May 25, 2017, at 1:01 p.m., Facebook Post also falsely states that Dean was, at that time "out" implying he had been terminated from his position as principal. Dean had not been terminated from his employment on May 25, 2017; Dean's date of termination from his employment was May 30, 2017.

26.     A printed copy, downloaded from the Internet, of Defendant Easterling's May 25, 2017, 1:01 p.m. public Facebook Post concerning Dean is attached for the Court as Exhibit C.

27.     The false statements contained in Defendant Easterling's May 25, 2017, 9:45 a.m. Facebook Post and the YouTube Video, cited as factual by the press, were of direct cause to Dean's eventual termination from employment at Crescent Leadership Academy.   Prior to Defendant Easterling's defamatory statements, which were picked up by the press and cited as fact, Dean had received positive coverage from the press as illustrated in numerous positive media stories about Dean's leadership at Crescent Leadership Academy.

### Defendant NOLA.com

28.     On May 25, 2017, Defendant NOLA.com published an article by Danielle Dreilinger, entitled "New Orleans principal loses job after wearing Nazi-associated rings in video" (May 25 Article).  The May 25 Article contains untrue, spurious, defamatory, slanderous, and libelous information about Dean.

29.     The May 25 Article states incorrectly that Dean lost his job "shortly after a video surfaced showing him wearing rings associated with white nationalism and the Nazi movement." Dean attended the rally as an individual concerned with the actions of the local government. He has never had any involvement with white nationalist organizations. Moreover, the "Nazi SS Skull" noted in the article and shown in Defendant Easterling's YouTube Video, is a Mexican sugar skull. The German Iron Cross precedes the Nazi regime and is no indication whatsoever of any white nationalist sentiment on the part of Dean.

30.     The May 25 Article contains a photograph, which is a screenshot from Defendant Easterling's May 25, 2017 YouTube Video, with the caption "Crescent Leadership Academy Principal Nicholas Dean appeared in a video wearing rings associated with white nationalism

and the Nazi movement," repeating the false and defamatory statements made by Defendant Easterling in his May 25, 2017, 9:45 a.m. Facebook Post and the YouTube Video.

31.     The May 25 Article repeats in its opening paragraph, the false statement that Dean was shown in a video "wearing rings associated with white nationalism and the Nazi movement."

32.     The May 25 Article, after quoting Dean as stating that he was not protesting either side in the monument removal, and, after quoting Dean's statement on a podcast that he is not a "white supremacist or KKK member," then states, referring to Defendant Easterling's May 25, 2017, YouTube Video, that the video shows Dean "wearing two rings that appear similar in design to those used as symbols of white nationalism: a German Iron Cross and a skull ring that was awarded to key members of the SS."  Here, Defendant NOLA.com, apparently fully aware that the statements being made were false and defamatory, attempted to insulate itself from litigation by including the phrase "appear similar in design" when stating that the rings worn by Dean in the YouTube Video were "symbols of white nationalism."

33.     In the remainder of the May 25 Article NOLA.com maligns Dean's character by amassing inferences that Dean's statement of his neutrality on the monument removal issue was untrue and that he supported monument removal, an inference which is intended to malign Dean's character.

34.     The May 25 Article refers to the cross ring worn by Dean in the video and, with quotes from the Anti-Defamation League and the Southern Poverty Law Center, and concludes that Dean's mode of dress in the YouTube Video is "very popular among 'alt-right' street activists."  Dean is not an "alt-right street activist."

35.     The May 25 Article quotes Defendant Easterling's video, stating that the event at which Dean appeared was the "May 7, 2017 'Battle of New Orleans' aligned with known white nationalist organizations, such as the Ku Klux Klan, League of the South and the Based Stick Man movement."   Members of the public both in support of and in opposition to monument removal attended the May 7, 2017 event; Dean was not aligned with either side of the controversy.

36.     The May 25 Article cites Dean's appearance on an internet podcast during which he was interviewed about his firing.   Defendant NOLA.com takes every opportunity to cite statements of Dean and his appearance on the podcast as supposed evidence that his statement of neutrality on monument removal was untrue and to prove that Dean is, in reality, someone who holds opinions that are generally vilified by the public.   NOLA.com later retracted one such statement in the May 25 Article that had been incorrectly attributed to Dean; the statement made by another guest on the podcast.

37.     The May 25 Article delineates the alleged failure of Dean to sufficiently disavow a statement by the podcast host about the political opinions of college professors, in general, which NOLA.com, as a member of liberal media, finds objectionable.   The article further states that the podcast was reposted by a "racist site," implying that because Dean appeared on the podcast, he must be a racist.   Dean has no knowledge of or control over whether the podcast was reposted and no knowledge as to whether it was reposted by a so-called "racist" site.   Defendant NOLA.com's association of Dean with a so-called "racist site" is another attempt to damage his reputation by amassing supposed proofs that his statement of neutrality on monument removal was untruthful and that he is actually a racist whose firing was justified.

38.    A printed copy, downloaded from the Internet, of Defendant NOLA.com's May 25 Article, **as it currently appears on** Defendant NOLA.com's website, entitled "New Orleans principal loses job after wearing Nazi-associated rings in video'" is attached for the Court as Exhibit D.  An alternate (shortened) version of Defendant NOLA.com's May 25 Article entitled "New Orleans principal loses job after wearing Nazi-associated rings in video" downloaded from the Internet, is attached for the Court as Exhibit E.  Plaintiff Dean will establish through discovery, the chronology of edits and changes made to the May 25 Article appearing online at Defendant NOLA.com's website.

39.    On May 26, 2017, Defendant NOLA.com published an "opinion" article by Jarvis DeBerry, entitled "Principal in Nazi gear is gone, just like the monuments he supported: Opinion" (May 26 Article).  The May 26 Article contains untrue, spurious, defamatory, slanderous, and libelous information about Dean.  The inclusion of untrue, spurious, defamatory, slanderous, and libelous information about Dean in an "opinion" article does not shield Defendant NOLA.com from liability for the defamatory statements contained in the May 26, 2017 Article, which it published.

40.    The May 26 Article contained numerous defamatory statements including, "the principal of a New Orleans public school (referring to Dean) decided to walk outside wearing his Nazi paraphernalia…"; "we wouldn't know of his racist beliefs…."; "If he's going to dress up like a Nazi and talk Nazi talk…"; and the May 26 Article also refers to Dean as a "Nazi getting hired as a principal."  Dean is not and has never been a "Nazi" or associated with any group identified as or identifying itself as a "Nazi" group.  Dean was not, on the occasion referred to by the May 26 article or at any other time, wearing "Nazi paraphernalia" and was not "dress[ed] up like a Nazi." Dean does not hold "racist beliefs."

41.     The May 26 Article speculates that Dean had "ulterior motives", implied to be negative motives, in seeking and holding a job as principal of an "almost all-black school." Dean had no negative or "ulterior" motives in working for eleven (11) years for Rite of Passage, a company that manages schools for troubled, at-risk, and vulnerable children in several states. As will be shown at trial, Dean worked for Rite of Passage at four (4) different schools, working his way up from teacher to the position of principal.   Dean and the schools at which he was employed received numerous accolades for the accomplishments made with and on behalf of students during his employment.

42.     The May 26 Article refers to a "video [presumably Defendant Easterling's YouTube video] of Dean wearing "Nazi paraphernalia" and states that the video shows Dean "wearing two rings that have been used as symbols of white nationalism: a German Iron Cross and a skull ring that was awarded to key members of the SS."   These statements by Defendant NOLA.com are untrue, spurious, defamatory, slanderous, and libelous as neither the skull ring nor the Iron Cross ring worn by Dean in the photograph and video have any connection to the "Nazi" party/regime or to the "SS."   The skull ring worn by Dean in the photograph is a Mexican "sugar skull" ring and the Iron Cross or Maltese cross ring worn by Dean in the photograph is a version of the Christian cross that predates and is not, in the form worn by Dean, a symbol of the Nazi regime.

43.     The false statements published by Defendant NOLA.com in the May 26 Article were, by the authors admission, intended to interfere with Dean's employment opportunities and blacklist him from the educational profession.

44.     Defendant NOLA.com's intent to interfere with Dean's employment opportunities and blacklist him from the educational profession is further evidenced by its publication of a

previous article, on May 22, 2017, updated May 23, 2017, by Danielle Dreilinger, entitled "Principal photographed with Confederate monument protesters is 'removed from campus'" (May 22 Article).

45.    A printed copy, downloaded from the Internet, of Defendant NOLA.com's May 22 Article entitled "Principal photographed with Confederate monument protesters is 'removed from campus'" is attached for the Court as Exhibit F.

<b>Publication and Dissemination</b>

46.    On information and belief, Defendant Easterling's public Facebook account, Abdul Aziz, had numerous account "followers" on May 25, 2017, (the precise number to be determined through discovery) in whose timelines the post appeared.  These followers had the ability to immediately "share" Defendant Easterling's May 25, 2017, public Facebook Post, in turn to their followers, in an exponentially increasing manner across the Internet; additionally, Defendant Easterling's May 25, 2017, Facebook Post being a public, rather than a private post, became available, beginning May 25, 2017, and continuing through this date, to anyone using the internet with access to Facebook (upon information and belief, all Internet users, whether registered with Facebook or not, can access public Facebook Posts).  Accordingly, starting on May 25, 2017, and continuing through the current date, Defendant Easterling's May 25, 2017 public Facebook Post became available to persons in this district, Florida in general, the United States as a whole, and internationally via the Internet.

47.    On information and belief, Defendant Easterling's public YouTube account, Abdul Aziz, had numerous account "subscribers" on May 25, 2017, (the precise number to be determined through discovery) in whose recommendations the video appeared.  Additionally Defendant Easterling's May 25, 2017 YouTube Video was immediately available to anyone

searching the internet for information on the removal of the monuments in New Orleans and the video appeared in the recommendations of YouTube users according to a proprietary algorithm used by YouTube to recommend content to anyone accessing its site.  Members of the public accessing YouTube also immediately had the ability to "share" the Video and/or "embed" it in, for example, social media posts, forums, and blogs, across the internet.  As of January 28, 2019, Defendant Easterling's May 25, 2017 YouTube Video had a count of over 32,000 views. Accordingly, starting on May 25, 2017, and continuing through the current date, Defendant Easterling's May 25, 2017 YouTube Video became available to persons in this district, Florida in general, the United States as a whole, and internationally via the Internet.

48.     Defendant Easterling's May 25, 2017 public Facebook Post was made at 9:45 a.m., Central Time; the time of publication of Defendant Easterling's May 25, 2017 YouTube Video is to be determined through discovery.

49.     Upon information and belief, Defendant Easterling's May 25, 2017 public Facebook Post (or Defendant Easterling's May 25, 2017 YouTube Video if determined through discovery to have been earlier in time on that date) is the first publication by Defendant Easterling of which Dean was the subject or in which Dean was mentioned.

50.     Defendant Easterling's May 25, 2017 public Facebook Post and Defendant Easterling's May 25, 2017 YouTube Video concern a (upon information and belief: permitted) public protest of the removal of Confederate Monuments in New Orleans, Louisiana on May 7, 2017.  Defendant Easterling's May 25, 2017 public Facebook Post and YouTube Video are devoted to Dean, one of many members of the public who participated in the public assembly. Defendant Easterling refers to Dean in relation to an allegation that there ensued something referred to by Defendant Easterling as a "Battle of New Orleans" inferring some kind of public

altercation, which, if any such event occurred, did not involve Dean.  Defendant Easterling's May 25, 2017 public Facebook Post concentrated on Plaintiff and did not mention any other members of the public who appeared on May 17, 2017 to engage in the free exercise of speech and public assembly, which are rights guaranteed by the Constitution of the United States.

51.    A Facebook Post detailing the public events surrounding the Confederate Monument events in New Orleans on May 7, 2017 could have been written and would still have been complete had Dean been omitted entirely from the Facebook Post.  Upon information and belief, many individuals appeared in public in the City of New Orleans on May 7, 2017, either in support of or in opposition to the removal of the City's Confederate Monuments.  Information about Dean is not necessary to convey a description of the event or its participants.

52.    Defendant Easterling's May 25, 2017, public Facebook Post and YouTube Video remain available on the worldwide Internet through today.  The YouTube Video has been viewed more than 32,000 times.

53.    Defendant Easterling's May 25, 2017, textual and photographic depictions of Plaintiff have been published in both print and Internet editions of The Huffington Post, The Root, The Daily Mail, Atlanta Black Star, The New Orleans Advocate, The Times-Picayune, NOLA.com, Yahoo Canada, and others; these have also been broadcasted on radio programs by stations WBOK and WWL.

54.    On information and belief, members of the public in the state of Florida viewed Defendant Easterling's May 25, 2017, public Facebook Post and YouTube Video.

55.    On information and belief, Defendant NOLA.com on May 25, and May 26, 2017 published the May 25, and May 26 Articles on its internet website, which functions as a daily online newspaper.  Defendant NOLA.com's May 25, and May 26 Articles became available on

their dates of publication and continuing through this date, to anyone using the internet.  All Internet users can access the NOLA.com website and where the articles regarding Dean remain posted.  Accordingly, starting on May 25, and May 26, 2017, and continuing through the current date, Defendant NOLA.com's May 25, and May 26 Articles became available to persons in this district, Florida in general, the United States as a whole, and internationally via the Internet.

56.     On information and belief, members of the public in the state of Florida viewed Defendant NOLA.com's May 25, and May 26 Articles.

57.     Defendants' defamatory statements against Dean are exceedingly numerous, extensive, detailed, and defamatory in numerous respects.  Many of Defendants' statements each include multiple and overlapping topics of defamation against Dean.

58.     By letter to Defendant Easterling dated April 17, 2019, Counsel for Dean made a Demand for Retraction of Defamation Pursuant to §770.01 Florida Statutes of the two May 25, 2017 public Facebook Posts and the May 25, 2017 YouTube Video.  Defendant Easterling has not published or posted a correction or retraction.  His Facebook Posts and YouTube Video are still posted on - and being published on – the Internet and other media sites.  A copy of the April 17, 2019 Demand letter is attached as Exhibit G.

59.     By letter to NOLA.com dated April 17, 2019, Counsel for Dean made a Demand for Retraction of Defamation Pursuant to §770.01 Florida Statutes of NOLA.com's May 25 and May 26 Articles about Dean. Defendant NOLA.com has not published or posted a correction or retraction.  Defendant NOLA.com's May 25 and May 26 Articles are still posted on the Internet on the NOLA.com website.  A copy of April 17, 2019 Demand letter to Defendant NOLA.com is attached as Exhibit H.

**Use of False and Misleading Information by Defendants and/or Failure to Fact Check**

60.     Defendant Easterling's defamation that Dean appeared in public in connection to a "Battle of New Orleans" inferring that Dean participated in a public altercation is false and misleading including but not limited to the fact that Dean was not involved and did not participate in any altercation that may or may not have occurred on May 7, 2017.

61.     Defendant Easterling's defamation of Dean that the rings worn by Dean on May 7, 2017, depict a "Nazi SS skull" and a "German Iron Cross" and that the rings are "both symbols of the Nazi regime" is false and misleading, including but not limited to the fact that neither the skull ring nor the Iron Cross ring worn by Dean in the photograph and video have any connection to the "Nazi" party/regime or to the "SS."   The skull ring worn by Dean in the photograph is a Mexican "sugar skull" ring, which is a Latin ornamental ring.  The Iron Cross or Maltese cross ring worn by Dean in the photograph is a version of the Christian cross that dates back to the 12th century.   The German Iron Cross remains the equivalent of the American Medal of Honor; in 2010 the German Army awarded fourteen American soldiers the Iron Cross for risking their lives to save German soldiers.  The Anti-Defamation League ("ADL") states on its website that "the use of the Iron Cross in a non-racist context has greatly proliferated in the United States" and that an "Iron Cross in isolation (without a superimposed swastika or without other accompanying hate symbols) cannot be determined to be a hate symbol."  Dean's Iron Cross ring does not have a superimposed swastika and is not accompanied by any other "hate symbol."

62.     Defendant Easterling's defamation of Dean publishing that that Dean was, on May 7, 2017, "aligned" with "known white nationalist organizations, such as the Ku Klux Klan, the League of the South, and the Based Stick Man movement" is false and misleading, including but not limited to the fact that on May 7, 2017, Dean was neither present as a member of nor was

he "aligned with" any "known white nationalist organizations" named by Defendant Easterling or otherwise.  Dean was present as a private individual interested in the expected removal of the statue of General Robert E. Lee from atop a tall column in a small park located at the intersection known as Lee Circle.  Dean was exercising his Constitutional right of assembly to gather with other members of the public concerned about the actions of New Orleans' City government in removing the Lee statue, which had been extant in and had constituted a part of the history, culture, architecture, and tourism industry of the City of New Orleans for over 80 years, as well as concerned about the actions of violent Antifa protesters attacking citizens gathered at the site. On May 7, 2017, Dean chose to stand in physical proximity with and offer protection to the nonviolent persons assembled.  On May 7, 2017, Dean chose not to stand in physical proximity with violent demonstrators, including Antifa members who had at an event on May 1, 2017, attacked members of the public without intervention by New Orleans police.  Dean's physical proximity to members of any particular organization or group does not constitute alignment with or membership in such groups.  On May 7, 2017, Dean wore a batting helmet and carried a wooden shield as protection from possible attacks by members of Antifa because he was aware of violence perpetrated on persons assembled at the May 1, 2017, event.

63.     In his May 25, 2017 Facebook Posts and YouTube Video, Defendant Easterling falsely stated that the rings worn by Dean depict a "Nazi SS skull" and a "German Iron Cross" and that the rings are "both symbols of the Nazi regime."  These false statements were cited as fact and disseminated by the press, however, the New Orleans Advocate in its May 25, 2017 article on the story, included the following statement from the Anti-Defamation League (ADL)

> Mark Pitcavage, of the Anti-Defamation League's Center on Extremism, said Spartan symbols are often used by rightwing extremists, though he added that the video alone in this case was not enough to conclude Dean has white supremacist or Nazi leanings. He expressed some doubts that Dean's skull ring was actually a

reference to the so-called Totenkopf, an old German symbol made up of a skull and crossbones that was often used by the Nazis. And he said the Iron Cross is not necessarily used as a hate symbol.

Had Defendant Easterling checked his allegations with the ADL, as the Advocate did, he would have known his statements were false and misleading.

**Actual Malice and Punitive Damages: Defendant Easterling is an Expert in Journalism**

64.     Actual malice can be found if Defendant Easterling published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

65.     Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquiries were made after the editors knew or should have known that the published accounts were untrue.

66.     Actual malice can also be proved by circumstantial evidence.   Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a Defendant Easterling's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

67.     Defendant Easterling styles himself as a "photo-journalist" and as such should be trained, experienced, and disciplined in journalistic standards and ethics.

68.     Defendant Easterling's May 25, 2017 Facebook Posts and YouTube Video are not neutral reports in which errors could be classified as simply inadvertent. Defendant Easterling's May 25, 2017 Facebook Posts and YouTube Video constitute an intentional, politically driven, falsified, and misleading attack on Dean, which was meant to cause Dean to lose his job. Defendant Easterling's May 25, 2017. 1:01 p.m. Facebook Post shows that he felt he had

accomplished his purpose by causing Dean to be "out" of his position at Crescent Leadership Academy.

## Use of False and Misleading Information by Defendant NOLA.com and/or Failure to Fact Check

69.     Defendant NOLA.com's defamation, in its May 25 Article, includes but is not limited to the article's headline which states that Dean was "wearing Nazi-associated rings in video", is false and misleading including but not limited to the fact that the rings worn by Dean and shown in Defendant Easterling's YouTube Video, were not Nazi-associated rings, but rather, a Mexican sugar skull ring and a German Iron Cross ring, neither of which are Nazi-associated symbols and neither of which is an indication of any white nationalist sentiment on the part of Dean.

70.     Defendant NOLA.com's defamation, in its May 25 Article, includes but is not limited to the statement that Defendant Easterling's May 25, 2017, YouTube Video, shows Dean "wearing two rings that appear similar in design to those used as symbols of white nationalism: a German Iron Cross and a skull ring that was awarded to key members of the SS." Here, Defendant NOLA.com, apparently fully aware that the statements being made were false and defamatory, attempted to insulate itself from liability by including the phrase "appear similar in design" when stating that the rings worn by Dean in the YouTube Video were "symbols of white nationalism." The rings worn by Dean in the YouTube Video, a Mexican sugar skull ring and a German Iron Cross ring, were not symbols Nazi association or of white nationalism.

71.     Defendant NOLA.com's defamation, in its May 25 Article, includes but is not limited to an attempt to damage Dean's reputation by amassing supposed proofs that his

statements of neutrality on monument removal, also included in the May 25 Article, were untruthful and that he is actually a racist whose firing was justified.

72.     Defendant NOLA.com's defamation, in its May 25 Article, includes but is not limited to its conclusion that Dean's mode of dress in the YouTube Video is "very popular among 'alt-right' street activists."  Dean is not an "alt-right street activist."  Thus, in addition to making false and misleading statements regarding Dean's apparel, Defendant NOLA.com infers that Dean's statements of neutrality on the question of monument removal must be a lie since he was dressed in a manner that is "very popular among 'alt-right' street activists."

73.     Defendant NOLA.com's defamation, in its May 25 Article, includes but is not limited to the inclusion of a photograph, which is a screenshot from Defendant Easterling's May 25, 2017 YouTube Video, with the caption "Crescent Leadership Academy Principal Nicholas Dean appeared in a video wearing rings associated with white nationalism and the Nazi movement," repeating the false and defamatory statements made by Defendant Easterling in his May 25, 2017, 9:45 a.m. Facebook Post and the YouTube Video.  The rings worn by Dean in the YouTube Video, a Mexican sugar skull ring and a German Iron Cross ring, were not symbols Nazi association or of white nationalism.

74.     Defendant NOLA.com's defamation, in its May 26 Article, includes but is not limited to the headline of the article, which states that "Principal in Nazi gear is gone, just like the monuments he supported: Opinion."  Dean was not "in Nazi gear" and did not support the Confederate monuments.  The rings worn by Dean in the YouTube Video, a Mexican sugar skull ring and a German Iron Cross ring, were not symbols Nazi association or of white nationalism. Dean was present as a private individual exercising his right of assembly guaranteed in the First Amendment to the United States Constitution.  Dean attended the rally as

an individual concerned with the actions of the local government. He has never had any involvement with white nationalist organizations.

75.     Defendant NOLA.com's defamation, in its May 26 Article, includes but is not limited to numerous defamatory statements including, "the principal of a New Orleans public school (referring to Dean) decided to walk outside wearing his Nazi paraphernalia…"; "we wouldn't know of his racist beliefs…."; "If he's going to dress up like a Nazi and talk Nazi talk…"; and the May 26 Article also refers to Dean as a "Nazi getting hired as a principal." Dean is not and has never been a "Nazi" or associated with any group identified as or identifying itself as a "Nazi" group.  Dean was not, on the occasion referred to by the May 26 article or at any other time, wearing "Nazi paraphernalia" and was not "dress[ed] up like a Nazi." Dean does not hold "racist beliefs."

76.     Defendant NOLA.com's defamation, in its May 26 Article, includes but is not limited to Article refers to a "video [presumably Defendant Easterling's YouTube video] of Dean wearing "Nazi paraphernalia" and states that the video shows Dean "wearing two rings that have been used as symbols of white nationalism: a German Iron Cross and a skull ring that was awarded to key members of the SS."   The skull ring worn by Dean in the photograph is a Mexican "sugar skull" ring and the Iron Cross or Maltese cross ring worn by Dean in the photograph is a version of the Christian cross that predates and is not, in the form worn by Dean, a symbol of the Nazi regime.

**Actual Malice and Punitive Damages: Defendant NOLA.com is an Expert in Journalism**

77.     Actual malice can be found if Defendant NOLA.com published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

78.     Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquiries were made after the editors knew or should have known that the published accounts were untrue.

79.     Actual malice can also be proved by circumstantial evidence.   Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a Defendant NOLA.com's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

80.     Defendant NOLA.com is the official journal of the Parish of Orleans, styles itself a newspaper and a news organization and as such should use trained, experienced, and disciplined journalistic standards and ethics.

81.     Defendant NOLA.com's May 25 and May 26 Articles are not neutral reports in which errors could be classified as simply inadvertent.   Defendant NOLA.com's May 25 and May 26 Articles constitute intentional, politically driven, falsified, and misleading attacks on Dean, which were meant to cause Dean to lose his job and to blacklist him in the education profession.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### *Common Law Defamation "Per Se"*

82.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

83.     Defendants have defamed Dean by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

84.     Defendants made false statements that are Defamation *Per Se*, accusing Dean of alignment with groups vilified in the minds of most Americans.

85.     **First**, among other accusations, Defendants state that Dean participated in a "Battle of New Orleans" inferring that Dean participated in a public altercation.  This is Libel *Per Se*.

86.     **Second**, among other accusations, Defendants state that Dean wore rings on May 7, 2017, depicting a "Nazi SS skull" and a "German Iron Cross" and that the rings are "both symbols of the Nazi regime."  This is Libel *Per Se*.

87.     **Third**, among other accusations, Defendants state that Dean that Dean was, on May 7, 2017, "aligned with "known white nationalist organizations, such as the Ku Klux Klan, the League of the South, and the Based Stick Man movement."  This is Libel *Per Se*.

88.     Defendants knew that their public statements about Dean would cause severe damage to the reputation, business opportunities, social relationships, and the career of Dean.

89.     A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, if it tended to injure Plaintiff in his trade or profession.

90.     A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a

woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

91.    For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So.2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

92.    Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes them to be harmful as a matter of law. *Dean v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

## SECOND CAUSE OF ACTION

### *Common Law General Defamation*

93.    Plaintiff Dean repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

94.    The Defendants have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

95.    To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) if the subject were a public figure, which Dean is not, that the Defendants acted with

knowledge or reckless disregard as to the falsity; (4) actual damages; and (5) the statement must be defamatory.

96.     Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements, labeled First through Third, alleged under the First Cause of Action, *supra*, as Defamation *Per Se*, and here alleges that each of those statements are also General Defamation under Florida law.

97.     Dean thus claims here that if the Court finds that any of the statements, labeled First through Third, under the First Cause of Action above do not constitute as Defamation *Per Se*, then in the alternative Plaintiff claims here that any and all such statements not qualifying as Defamation *Per Se* constitute General Defamation against Plaintiff Dean.

98.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled First through Third, above.

99.     In addition, Defendants also made other defamatory statements that are also General Defamation.

100.     As General Defamation, Defendants published about Dean that he was "aligned" with "known white nationalist organizations, such as the Ku Klux Klan, the League of the South, and the Based Stick Man movement", which statement is false and misleading, for reasons including but not limited to the fact that on May 7, 2017, Dean was neither present as a member of nor was he "aligned with" any "known white nationalist organizations" named by Defendants or otherwise.  Dean was present as a private individual interested in the expected removal of the statue of General Robert E. Lee.

101.    As General Defamation, Defendants published about Dean that he participated in a "Battle of New Orleans" inferring that Dean participated in a public altercation, which, if any altercation occurred did not involve Dean.

102.    As General Defamation, Defendants published about Dean that he Dean wore rings on May 7, 2017, depicting a "Nazi SS skull" and a "German Iron Cross" and that the rings are "both symbols of the Nazi regime", which statements are false and misleading, for reasons including but not limited to the fact that the rings worn by Dean were not such symbols and Defendants failed to properly investigate and confirm the nature of the rings worn by Dean or purposely misrepresented said rings to sensationalize his Internet post and video.

103.    As General Defamation, Defendants, in their publications, randomly constructed every possible way to defame the Plaintiff, no matter how inconsistent, including failure to investigate or fact-check whether Dean was present at the event as a member of any organization rather than as a private individual and stating falsely as a fact that Dean was present as a member of groups generally vilified in public opinion;

104.    As General Defamation, Defendants, in their publications, implied that Dean was involved is a public altercation without confirming or fact-checking whether any public altercation occurred and whether Dean was involved in it;

105.    As General Defamation, Defendants, in their publications, failed to investigate or fact-check whether the rings worn by Dean were in fact "symbols of the Nazi regime", a claim that could easily have been checked and would have been disproved by a minimum amount of research.  Defendants failed to properly investigate and confirm the nature of their statements regarding Dean.

106.   As General Defamation, Defendants, in their publications, through gross negligence, failed to properly investigate or fact-check their statements, or purposely, in order to sensationalize their respective publications, misrepresented the facts in their statements about Dean.

## THIRD CAUSE OF ACTION

### *Common Law Defamation by Implication*

107.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

108.   Defendants have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

109.   For Defamation by Implication: "... [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).  Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

110.   Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First and Second Causes of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

111.   Plaintiff thus alleges here that if the Court finds that any of the statements, labeled First through Third, above do not constitute Defamation *Per Se* or General Defamation, then in

the alternative the Plaintiff re-alleges here that any and all such statements not constituting as Defamation *Per Se* or General Defamation are Defamation by Implication against the Plaintiff.

112. Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled First through Third, above.

113. Across the examples of libelous statements from his Facebook Posts and YouTube Video, Defendants published that the Plaintiff participated in a public altercation, wore symbols of the Nazi regime, and was aligned with organizations generally vilified by the public.

114. Thus, Defendants libeled and slandered Dean by implying that Dean's alleged participation in in a public altercation, alleged wearing of symbols of the Nazi regime, and alleged alignment with organizations generally vilified by the public made Dean unqualified to do his job as principal of a school attended predominantly by minority students.

<u>**FOURTH CAUSE OF ACTION**</u>

***Common Law Intentional Infliction of Emotional Distress***

115. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

116. Defendants' knowing and intentional publication of the harmful statements against the Plaintiff have foreseeably and proximately caused the Plaintiff emotional distress.

117. Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

118. Defendants' actions were willful, malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## FIFTH CAUSE OF ACTION

### *Common Law Tortious Interference with Prospective Advantage*

119.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

120.    Defendants understood that Plaintiff was pursuing a career in education and education administration, with a focus on assisting minority students.

121.    Defendants were aware that their publication of false and misleading statements about Dean harmed Dean's career and livelihood and his ability to earn a living in the field of education.

122.    Defendants' defamation disparaged Plaintiff's ability to work with students, particularly minority students, by implying that Plaintiff's activities and affiliations were racist.

123.    Defendants acted knowingly, willfully, and with reckless and negligent disregard of the harm that their publication of their false statements would cause to Dean's livelihood, career, and ability to earn a living, including his then current employment at Crescent Leadership Academy, and future employment as an educator and school administrator.

124.    Defendants acted with the intentional malicious purpose of defaming Plaintiff Dean as a way to cause Dean to lose his employment because of Defendants' disagreement with those in opposition to the Monument removal, with whom Defendants disagree in pursuit of their ideological and political agenda.

## SIXTH CAUSE OF ACTION

### *Common Law Assault (Apprehension)*

125.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

126.     Defendants' publication of the defamatory factual statements have placed Dean's life at risk by revealing and disclosing him to public notice by Antifa, which has been identified by the Office of Homeland Security as a terrorist organization, and other violent terrorist groups, in Florida, domestically, and internationally.

127.     Antifa has openly pledged to terrorize and inflict bodily harm ("punch") persons identified as "Nazis."

128.     Defendants have subjected Dean to an open call that any and all militant Antifa should kill or do bodily harm to Dean.

129.     Defendants have placed Dean in immediate fear of bodily harm, injury, and death to him and his family members.

130.     Defendants' tortious actions alleged herein were furthered and aided and abetted by members of the press who want to destroy Dean as a perceived member of a group vilified by the public.

## DAMAGES WITH REGARD TO ALL COUNTS

131.     As a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants, Dean demands judgment be entered against Defendants including an award of compensatory and actual damages in an amount to be determined at trial, as pled below, punitive damages, reasonable attorney's fees, pre-judgment interest, post-interest and costs, and such other relief as the Court may deem just and proper.

132.     As a result of Defendants' actions, Dean suffered significant personal harm, including to his professional endeavors and prospects, career, and finances.

133.    As just one example, Dean was in fact terminated from his employment, forced to leave the City of New Orleans, move to the state of Florida, and begin a career in a profession unrelated to his chosen field of education.

134.    Dean had obtained an undergraduate degree in Social Science and a Master's Degree in History.  He obtained a post-graduate certificate in Executive School Leadership, which was a one-year program conducted by the National Institute of School Leadership.  He then worked for Rite of Passage for eleven (11) years at four (4) different schools, working his way up from teacher to the position of principal.  Rite of Passage operates Charter Schools focusing on troubled, at-risk, and vulnerable youth.  Dean was highly respected member of his profession and an acclaimed teacher and administrator at each of the schools at which held positions while employed by Rite of Passage.  Dean will show that both he and the schools with which he was involved received acclamations and accolades during his involvement with each.

135.    As a result of his education and employment history, Dean would be employable in high paying jobs but for the defamation of his character and other tortious actions by the Defendants.

136.    Defendants' conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately, or with reckless indifference or negligence, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

## **PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, for compensatory and actual damages in excess of $3,000,000 U.S. Dollars resulting from their

financial, reputational, emotional and professional injury to Plaintiff, as well as equitable relief as may be appropriate, and such other relief the Court may deem just and proper. Plaintiff further prays for an award of punitive damages in an amount in excess of $15,000,000 U.S. Dollars, to punish Defendants for their outrageous, deceitful, unprecedented, vicious, and malicious conduct toward Dean designed so Defendants can reap huge profits for their defamatory works. Defendants' actions have left Plaintiff in ruins. Large punitive damages will deter Defendants from committing such egregious acts in the future against Dean and others similarly situated.

## **JURY DEMAND**

Plaintiff respectfully demands a jury trial on all issues so triable.

Dated: May 15, 2019                    Respectfully submitted,

/s/ Augustus Invictus
Augustus Invictus, Esq. – Trial Counsel
Florida Bar No. 98586
The Law Office of Augustus Invictus, Esq.
44489 Town Center Way, Suite D478
Palm Desert, CA 92260
Phone: (310) 824-3725
Email: InvictusPA@protonmail.com
Attorney for Plaintiff